IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
July 17, 2002 Session

## STATE OF TENNESSEE v. CHRISTOPHER SHANE MAHONEY

**Direct Appeal from the Criminal Court for Davidson County**
**Nos. 2001-B-1021, 1022, 1256     Cheryl Blackburn, Judge**

---

**No. M2001-02887-CCA-R3-CD - Filed November 1, 2002**

---

The defendant, Christopher Shane Mahoney, pled guilty to two counts of money laundering, a Class B felony, and one count of conspiracy to engage in money laundering, a Class C felony, receiving a three-year sentence and two eight-year sentences, and to promoting prostitution, a Class E felony, receiving a two-year sentence. All sentences were to be served concurrently for an effective sentence of eight years. He timely appealed, arguing that he was improperly sentenced, both as to the lengths of the sentences and the trial court's not placing him on probation or community corrections. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

David A. Collins, Nashville, Tennessee, for the appellant, Christopher Shane Mahoney.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and John C. Zimmermann and Tammy Haggard Meade, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The "Petition to Enter Plea of Guilty," bearing the defendant's signature and date of September 12, 2001, sets out that the State's recommendations as to the sentences would be eight years as a Range I offender in each of the money laundering cases, three years for conspiracy to engage in money laundering, and two years for promoting prostitution. At the sentencing hearing, the State outlined the evidence against the defendant:

> In this case, State of Tennessee vs. James Whitby, William Shane,
> Melissa Sleeper, and Christopher Mahoney, 2001-B-1021 and 1022,
> in this case, Your Honor, these cases arose out of an investigation of

an escort service operated by the defendant, Terry Price, and his sons, Donald Price and Troy Price, Charlene Walker and Deborah Walker.

These defendants were employed with these individuals and by them. Mr. Whitby, Mr. Shane, and Mr. Mahoney performed services as chauffeurs for prostitutes. The prostitutes would be dispatched by Mr. Terry Price's employees to locations to perform prostitution services. Ms. Sleeper was one of the prostitutes. She would negotiate fees for prostitution services with the customer. She would also obtain funds from the prostitution services and remit them to the driver, the chauffeurs in this case, constituting a financial transaction designed to promote the ongoing criminal activity. This prostitution business operated from the time of the indictment until May of 2000, and the conspiracy to commit money laundering, the conspiracy actually continued on up until May of 2001.

In Case 2001-B-1256, Mr. Mahoney, beginning in February of 2001, took over a portion of the business operated by Mr. Terry Price; leased, sub-let telephone lines that were subscribed to by Mr. Terry Price, began his own prostitution business known as VIP Entertainment, employed two women to act as prostitutes for him and designed a business operation much like I've outlined with regard to the case of Mr. Terry Price and others.

On February 15, 2001, and April 12, 2001, Mr. Mahoney made payments from the prostitution funds, in Count 3, of eight-hundred-forty-three dollars ($843.00) to BellSouth Telephone Company for telephone subscription services, and in Count 4, on February 15, 2001, to BellSouth Telephone Company for Yellow Page advertising services in the amount of six-hundred-forty-three dollars ($643.00); both of these transactions representing funds derived from prostitution activity and designed to promote and carry on the prostitution activity.

Robert Chaudoin, an investigator for the district attorney's office, testified as to the prostitution investigation, which involved persons in addition to the defendant:

THE COURT: Okay. When you talk about – let's see, when you first started this investigation, you looked in the phone book?

A. (WITNESS) Correct.

-2-

THE COURT: How many phone lines, phone numbers did you, just in the Yellow Pages or whatever, did you find?

A. (WITNESS) Without my notes, it was close to 300.

THE COURT: Three hundred, and they all went back to how many individuals?

A. (WITNESS) The vast majority of them went to seven. There are people that own one and two phone lines, but the vast majority of them went to the Prices, the Walkers, Mr. Blakely, and that is about it really.

THE COURT: Okay, so those people are – I mean, what kind of statement – could you make the statement that they were running the escort service business in Nashville?

A. (WITNESS) Yes, clearly.

THE COURT: Can you give me any idea, say during the course of the week, what those phone lines would bring in as far as income or what kind of income are we talking about?

A. (WITNESS) Well, I wish Investigator Draper was here. She could probably give a better handle on it than I could, but there are weeks the Prices would do anywhere from twenty-five hundred ($2,500) to nine-thousand dollars ($9,000.00); the Walkers somewhat less than that because they didn't have the number of lines.

THE COURT: All right, and just how does it work? Just give me a brief – like somebody calls into an escort service, what happens?

A. (WITNESS) They will call in. Generally, what we did on the stings, we would ask or give a description of the girl that we wanted. They wouldn't discuss any price on the phone. They would come to the room. The first thing they would say it's two-hundred ($200) an hour or three-hundred ($300) an hour. If you want an hour-and-a-half, I'll give you a good deal. The informant would ask what she would do, and she would detail the sex acts she would do. The money would change hands. She would pick up and call back to the dispatch center, I'm here, I'm going to be here an hour, I'm going to be here an hour-and-a-half. At the end of the hour, if she hadn't called back, they would call the room back. Then she would ask ten-

percent for the driver. If it was two-hundred dollars ($200.00), she would want twenty-dollars ($20.00) to tip the driver so she wouldn't have to take it out of her part of the money. If not, she had to tip the driver, which gave her only eighty-dollars ($80.00), and the proprietor a hundred dollars ($100.00).

THE COURT: Okay. Is this a rather large business in Davidson County?

A. (WITNESS) Unfortunately it still is.

THE COURT: And has this sting that you all did made any dent in it?

A. (WITNESS) No.

THE COURT: How many man hours have you all put into this investigation?

A. (WITNESS) Well, two solid years on Price and the Walkers alone. A year of surveillance before we did the first round of search warrants; ten months of analytical stuff of Investigator Draper before we started doing the reverse sting stuff, the probable cause for the second round of search warrants this past summer; doing discovery with 30-plus lawyers adds up to a lot of time.

## ANALYSIS

### Standard of Review

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

-4-

In conducting a *de novo* review of a sentence, this court must consider: (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987).

The party challenging the sentences imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentence imposed by the trial court is erroneous.

## Sentencing

The defendant argues on appeal that the trial court erred both in not considering whether mitigating factors should be applied and in denying alternative sentencing. We will review these claims.

The Tennessee Criminal Sentencing Reform Act of 1989, enacted to "promote justice," Tenn. Code Ann. § 40-35-102 (1997), provides that the sentence imposed upon an offender should be the "least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. § 40-35-103(4) (1997). Thus, trial judges are "encouraged" to use "alternatives to incarceration that include requirements of reparation, victim compensation and/or community service." Id. § 40-35-103(6) (1997). Since the defendant was convicted of two counts of money laundering, a Class B felony, he is not presumed to be a favorable candidate for alternative sentencing, as would have been the case had he been convicted of a Class C, D, or E felony, absent evidence to the contrary. Id. § 40-35-102(6) (1997).

In denying alternative sentencing, the trial court found as follows:

> Keeping in mind that he is eligible for both probation and Community Corrections, just because he is eligible does not mean that he is entitled to it and as a matter of fact, on the two convictions of money laundering, he is not presumed eligible for an alternative sentence because those would be felonies, whereas he is presumed eligible on the other cases.
>
> Looking at the Sentencing Act which is codified at 40-35-102 and 210, I have to consider the evidence at the trial, or in this case, just the submission hearing; the sentencing hearing, the Pre-Sentence Report; the principles of sentencing; the nature and characteristics of the crime; and I have to look at, and I can look behind the plea

-5-

agreement to look at the true nature of the offenses; any enhancing and mitigating factors; the statements of the defendant; and his potential for rehabilitation or treatment.

Clearly, based on the testimony I've heard today, this is an incredibly serious problem here in Davidson County, and the offenses are for, at least the most serious ones, are for money laundering.

Mr. Mahoney's range is at the bottom of the range. I will have to say that really my only issue is to determine the alternative sentence, and the thing I need to look at is whether confinement is necessary to protect society by restraining one who has a long history of criminal conduct; whether confinement is necessary to avoid deprecating the seriousness of the offense; and whether it is particularly suited to provide an effective deterrence to others likely to commit similar offenses; and whether or not the measures least restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

He does have a history of criminal conduct and that is at least on a daily basis, he is committing crimes in this county for at least four months, and even having contact with the police didn't deter him, but I believe the issue really before the Court is the issue of whether or not confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses and whether it is, would avoid deprecating the seriousness of the offense.

The Supreme Court, in State vs. Hooper, which is found at 29 S.W.3d, page one, g[a]ve a very explicit model for which we are to look at when we use deterrence, what we need to consider, and looking at that, I'm to consider whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the State as a whole. Clearly there has been testimony from Investigator Chaudoin about how pervasive this activity is in Davidson County.

Two, whether the defendant's crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior.

Well, he sat here and told me that he intentionally bought these phone lines, and that his hope was to make about three-

thousand dollars ($3,000.00) a week. I didn't inquire, but one can only assume that he did not intend to pay taxes on that money.

Number three would be whether the defendant's crime and convictions have received substantial publicity beyond that normally expected in a typical case. Well, clearly, when this occurred, when the defendants were indicted, when they were arrested, there was substantial publicity and photographs all over the paper and in this courtroom, when the defendants were arraigned, there were all the news stations that showed up. It has been of great interest all over the news with regard to this case, and I can take notice of that.

Number four is whether the defendant was a member of a criminal enterprise or substantially encouraged or assisted others in achieving the criminal objective. We have here someone who was a driver for the Prices, who then bought into the business or bought phone lines from them, paying along the way, and then sold out to other individuals, once he had been arrested, allowing this criminal enterprise to continue.

And five, whether the defendant has previously engaged in criminal conduct of the same type irrespective of whether such conduct resulted in arrest or convictions. Well, clearly, I think the important thing is that he was working for the Prices. Then got into a more administrative role so he could make more money. He was stopped by the police. Not only did he continue, but increased the number of phone lines.

All of those lead me to believe that there is really no choice in this case if the Court's role is to have any effect on deterrence value of the punishment, and that is that Mr. Mahoney is going to have to serve his sentence in the Department of Correction because the deterrent value and the need not to deprecate the seriousness of this offense is huge in this case, and I think every bit of proof goes to that effect, so as a result of that, Mr. Mahoney, in Case 2001-B-1021, for promoting prostitution, I sentence you to two years as a Range I standard offender. That will have to be served in the Department of Correction because of your other sentences.

As to 2001-B-1022, I'm sentencing you on the conspiracy to money launder to three years, which will also have to be served in the Department of Correction because of your other convictions.

And in 2001-B-1256, Counts 3 and 4, the conviction of money laundering, I sentence you to eight years on each one as a Range I standard offender.

It is obvious from the extensive findings that the trial court, without specifically identifying enhancement and mitigating factors, considered all relevant facts and circumstances, as well as the applicable sentencing principles, in determining the appropriate sentence for the defendant. Thus, we conclude that the trial court's comments belie the defendant's claim that mitigating factors were not considered. We now will review whether, as the defendant argues, the trial court erred in ordering that he be confined, rather than granting alternative sentencing.

Tennessee Code Annotated section 40-35-103 provides that the trial court may order confinement when:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

In sentencing the defendant to confinement, the trial court observed that "at least on a daily basis, he is committing crimes in this county for at least four months, and even having contact with the police didn't deter him." We note that, at the sentencing hearing, the defendant testified that he had worked "[o]ff and on" for his predecessors in the prostitution business from "late in '99" until "about January or February of [2001]." During that time, he knew that their offices had been raided by the police and that the business was illegal. He then elected to purchase telephone lines for $5000 from Terry Price so that he could operate the same business, anticipating an income of "about three-thousand" a week. Undeterred by the March 7, 2001, arrest of one of his "girls," and the warning by police officers, he increased his telephone lines from fifteen to twenty-nine. After his arrest and release on bond, he sold the telephone lines to Tim Blakely and Susan Hernandez "assuming" they would utilize them for prostitution, as had he.

In State v. Hooper, 29 S.W.3d 1, 10-12 (Tenn. 2000), which was substantially relied upon by the trial court in determining that the defendant should be incarcerated, our supreme court set out a list of nonexclusive considerations to guide the courts of this state in ascertaining whether incarceration was appropriate for purposes of "deterrence," noting that intentional acts, and those committed for profit, would appear to be more deterrable:

-8-

Actions that are the result of intentional, knowing, or reckless behavior or those motivated by a desire to profit from illegal activity are probably more deterrable than those which are not the result of a conscious effort to break the law. Indeed, this is the very rationale that underlies the deterrence aspect of punitive damages in tort law. See Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 (Tenn. 1992). Common sense tells us that we may have less ability to deter crimes which are the result of provocation, sudden and extreme passion, or even negligent behavior, irrespective of whether others who commit similar crimes are incarcerated or given probation.

Id. at 11.

Here, the defendant, by virtue of several years of part-time employment for the seller of the telephone lines, had observed, presumably, that prostitution, while illegal, was quite lucrative. We glean from the record that those who sold the telephone lines to him did so because they were, or were about to be, incarcerated. Even after being warned by the police, the defendant sought to increase his business by obtaining more telephone lines.

The defendant argues on appeal that the deterrence value of incarceration is substantially lessened because his sentencing hearing, and its results, were not publicized. However, the court in Hooper observed that the publicity need not be to society as a whole, but may be to the defendant's "professional community":

The defendant's crime and conviction need not be known to the community, jurisdiction, or state as a whole, so long as they are known to that discrete community of individuals likely to commit similar crimes. Criminal acts by a professional in his or her official capacity, for example, need not be publicized statewide before deterrence may be considered as a factor. In most cases, substantial publicity within the defendant's professional community would probably suffice to meet this factor.

Id.

## CONCLUSION

As did the trial court, we conclude that the evidence supports incarceration based upon the need for deterrence. Accordingly, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE